We're ready for the second case, please. 25-3047 Stoneberger v. BP Energy Company. Please proceed. Thank you, your honor. May it please the court. My name is Sam Mullins on behalf of the plaintiffs in these consolidated cases. I think the broad issue that these cases present is whether the state of Kansas has any authority whatsoever to protect its captive retail natural gas consumers in the face of a declared disaster and a failed natural gas market. The specific issue the district court decided below was that the Federal Natural Gas Act preempted the plaintiff's Kansas Consumer Protection Act claims. For three reasons, the district court erred and the plaintiff's Kansas KCPA claims are not preempted. The controlling case is the Supreme Court's decision in One Oak, Inc. v. Learjet, Inc. that controls for three reasons. The test under field preemption in the Natural Gas Act context is whether the state law aims at the market at the FERC jurisdictional market of sales for resale or interstate transportation of natural gas. Here, the KCPA does not specifically aim at that market like antitrust. Is it whether the statute itself aims at it or whether the specific action taken under that statute aims at that market? I think that's a critical distinction, your honor, and the answer is, in our view, it is the law. The plain language of the Supreme Court's reasoning in One Oak is what is the target of the law. So in One Oak, you didn't really have to look at the markets at all. It could see it was an antitrust case and that's not targeted natural gas, so case over. Why did the Supreme Court have to go into all these other considerations? Well, there are really two primary considerations. One is that the antitrust statutes were broad laws of general applicability. They're enacted pursuant to state's historic police power, just like the Kansas Consumer Protection Act is, and that I think the other key in One Oak is that what the court was looking at in particular was a Wisconsin statute, specifically section 133.18 and a Kansas statute, Kansas statute 50-161B. Both of those antitrust statutes allow for claims by plaintiffs, whether they were direct or indirect purchasers, and when the Supreme Court was construing those two statutes in One Oak, it didn't draw a distinction in those laws themselves between plaintiffs who were direct purchasers under either 133.18 or 50-161B and those who were just direct purchasers. And that should have ended the case then. They didn't need to decide that they're not seeking any constraints on interstate, that they're focused on retail sales that are local. That was irrelevant to the result in One Oak then, is that what you're saying? I wouldn't go so far as saying it was totally irrelevant, Your Honor, because under the facts of One Oak, the plaintiffs alleged, and it was a review of a summary judgment order, that the plaintiffs were all direct purchasers, and the practices at issue affected both state-regulated retail rates and federal-regulated wholesale rates. That fact wasn't necessarily dispositive, isn't dispositive here, because what the plaintiffs are complaining about are state-regulated retail rates and its conduct in connection with those retail rates that are at the heart of the plaintiff's complaints. Well, your only complaint about the retail rates is that they responded to rates on interstate transactions. Isn't that right? Well, I think it is correct to an extent, but it's, again, not dispositive because as the plaintiff says versus EPSA, the retail and the wholesale markets, in One Oak's terms, there's no platonic separation. In EPSA's terms, the markets are not hermetically sealed from one another. In other words, something that happens in one market can affect the other. Yes, Your Honor. And in One Oak, the market that was being targeted was the retail market, and the rates set in that market could affect the rates established for interstate market. Here, what's being targeted are interstate rates, the wholesale rates, and those certainly can affect what the retail rates are going to be. So it's a mirror image of One Oak, is it not? I disagree, Your Honor, that the wholesale rates are exactly what's being targeted here, and the distinction is the target is what is the target of the law. And the target of the law here is the Consumer Protection Act. Judge Hart's hit on, well, both of his points are key points, but on the question of what is the target, One Oak specifically says on page 386, quote, the lawsuits are directed at practices affecting retail rates. The lawsuit, not the law, the lawsuit. And so why doesn't that language support the notion that what we're talking about is the claims, not the law? And again, that would bleed into Judge Hart's second point, which is that really what you're focusing on is how those claims affect retail rates. I think, I'm sorry. No, or the reverse, actually, here. I think two points, Your Honor. First, the lawsuits here are directed at retail rates. It is the Kansas Consumer Protection Act claim is predicated on a consumer transaction. You have to be a consumer. That is a person in Kansas at the end of the supply chain that purchases household goods, enters a consumer transaction, that's a disposition per value in Kansas for property from a supplier. And what matches in the KCPA and the antitrust statutes at issue in One Oak is that the definition of supplier includes those suppliers who are engaging in or enforcing consumer transactions, whether or not dealing directly with the consumer. And that matches the statutory language in the Wisconsin statute, section one, excuse me, section 133.18 and KSA 50-161B. My second point on that, Your Honor, is I think it goes more to whether the Supreme Court's analysis in Kearns versus railroad friction products should apply here. I thought you said One Oak was our guiding star. And if One Oak is our guiding star, that language would suggest that we're focusing on claims and Judge Hart's point about essentially, well, there's always going to be an impact on retail rates, even if you affect wholesale rates. And so the notion being, why in every case where retail rates are as a derivative matter affected, you're saying that there is not preemption? I think I'm not saying every case. You're saying this case? Well, in this case, there are certainly special circumstances in this case. We have a declared disaster, an obviously failed market. Prices had skyrocketed from $2.50 on February 1st to $622 by February 17th. The people that bear the brunt of those prices are retail rate payers. And to get back a little bit... But the retail rates here are, I think you allege this, are entirely a product of the rates upstream, right? It is. So it may depend on the distributor, Your Honor, but each distributor, at least if they're the three that are regulated by the KCC... But didn't you allege there was pass-through? The pass-through is in its entirety all the way down to the retail. So the retail rates here are wholesale level. They are in large part the cost of the gas that is acquired. In large part or entirely? Well, there are other costs that distributors have to account for that can account for the cost of the natural gas that's spread across the consumer base. But in large part, the purchase gas authorization passes the cost of wholesale transactions that the distributors enter onto the retail market. And why does that create a significant problem for you? I mean, if we're focused on what is the target of the claim and your acknowledgement that really, to the extent that retail rates are affected, which would be perhaps outside the zone of preemption, to the extent that retail rates are affected, they're only affected as a derivative matter because wholesale rates are affected. And wholesale rates from a distributor put you in the zone of preemption, don't they? No, Your Honor. And if I may, I just want to push back and try one more time at One Oak and whether this One Oak focuses on the nature of the claim. Tell me what to do with the language that I quoted to you. That the lawsuits are what the lawsuits were aimed at. I understand that. But the test that Justice Kennedy set forth was the target at which the state law aims. And what's important in understanding, I think, that phrase is what the court initially said and what the court rejected in the defendant's briefing was this distinction between a Kearns versus railroad friction products analysis and a Spreetsma versus Mercury Marine analysis, which I think turns the case in the plaintiff's favor here. And what was the issue was in Kearns is the Locomotive Inspection Act. And Kearns relies on an earlier case that says the LIA admits of no exception to any state regulation whatsoever. That's a far cry from the savings clause in the Natural Gas Act in Section 1B, where the Natural Gas Act, as the Supreme Court has long said, expresses a meticulous regard for the continued exercise of state power and therefore to reserve power over retail, over production, Your Honor, and retail and local distribution. That's correct. But where that lines up is with the Supreme Court's initial citation in 1A to Spreetsma versus Mercury Marine. And what was important about Spreetsma is the case interpreting the Federal Boat Safety Act. And what that preemption clause does is it barred state laws or regulations and it didn't leave, it didn't say anything about barring state common law actions. And what happened, and so the state common law action in Spreetsma was allowed to go forward because Congress didn't expressly or impliedly grant that state common law action. And what's happening in the savings clause here in Section 1B is Congress is reserving to the states authority over retail rates. And that's what is ultimately at the heart of the plaintiff's claims is these retail rates in some cases will take up to a decade to pay back. And so this regulation by claim analysis that the district court accepted under Kern simply doesn't apply under the Natural Gas Act. A statute of cooperative federalism that still allows for states to exercise authority over retail rates. And the Supreme Court both in 1A and in EPSA, if I may reiterate, clarified that these markets are not, there's no hermetically ceiling between these markets. What happens in one inevitably affects. Let me put it this way. There's a difference between the target and the affected party. In One Oak, the target was retail rates. They affected wholesale rates. I would think that the target in your case would have to be at the level where the mistakes were made. You're not complaining about anything that the retail sellers did where they had to respond to the wholesale rates. Your complaint is about what happened at the wholesale level. Why isn't that the target? Just as the target in One Oak was the retail rates. It's not the target, Your Honor, because I point to the statutory language that we're relying on. The target of the Kansas Consumer Protection Act is the consumer. In its KSA 50-63B, the whole purpose of the Kansas Consumer Protection Act is to protect consumers from suppliers who commit deceptive and unconscionable acts and practices. Consumers, to be protected under the Kansas Consumer Protection Act, you have to be a consumer who entered a consumer transaction. So you said the target is the party, not the injurer? The target is the retail rate. I think that's what's important under the Natural Gas Act. Is the state exercising jurisdiction under the sphere of authority that Congress has given it? The state here under the KCPA is exercising jurisdiction over retail rates. It has defined supplier to include those who engage or enforce consumer transactions, whether directly or indirectly, interacting directly or indirectly. But that's no different than what the Supreme Court held not preemptive, the statutes themselves, the antitrust statutes themselves in One Oak. Is there any Kansas authority that defines supplier? The authority I would point to, we cited Stare v. Gaylord. Your Honor, as a Kansas Supreme Court decision, I believe from 1981, it applies the KCPA to a supply chain beginning with a manufacturer, Goodyear Tire, to a distributor and a dealer down to the consumer farmer. And it goes, it explains what solicitation engage and enforce is? Well, it explains that the KCPA applies to that supply chain and it does it by reference specifically to the statutory language. Another case is an unpublished case I'd point to, a Kansas Court of Appeals case called Cole v. Hewlett-Packard that discusses and describes that Hewlett-Packard in that case was a supplier who manufactured, I believe it was a computer or a printer that was sold to an employer that was then sold to an employee. I see I have 40 seconds left. I'd like to reserve if possible. Yes, of course. I'll allow you some time. So to follow up on Judge Hartz's question, then, if we were to adopt your position, what then prevents Clever Counsel in the future from using state laws that are of general applicability to circumvent FERC's authority, whether it's Consumer Protection Acts or any other statutory authority that would allow individuals to pursue or damage his claims? Yeah, I think the limiting principles are found in Section 1B of the Natural Gas Act and the language of 1-0 itself. So it has to be a broad law of general applicability. It must be a state law that relies on its historic police powers, the kind of police powers that Congress intended to preserve in the Natural Gas Act after the Supreme Court had invalidated several state regulations under the Dormant Commerce Clause. All right. Thank you. Thank you.  Good morning, and may it please the Court. Beatrice Franklin from Sussman Godfrey on behalf of Macquarie Energy, and today I'll be presenting an argument on behalf of all appellees. I'd like to begin with a language from one that Chief Judge Holmes was relying on, the language about looking at the target of what the lawsuits aim at. It comes from a paragraph where the Court, in Justice Breyer's opinion, was discussing a parallelism between Northern Natural, Northwest Central, and then the claims in that case. And the Court drew a distinction between the regulation at issue in Northern Natural, which was targeted at wholesale, the regulation at issue in Northwest Central, which was targeted at production on the state side of the divide, and then the lawsuits in 1-0, which were targeted at practices affecting retail rates and transactions that took place exclusively in the retail sphere. That language and the rest of the 1-0 analysis shows that 1-0 does not mean that state laws of general applicability are categorically exempted from a preemption analysis under the Natural Gas Act. If that were the case, the Court would not have proceeded to analyze what the actual conduct at issue in that case was. And then the Court, just a year later, in Hughes and EPSA, would not have provided a gloss on 1-0 that said that this positive fact in 1-0 was that the conduct there was all on the retail side of the bright line under the Natural Gas Act, and that at most, the lawsuits there had an incidental effect on the wholesale market. Plaintiffs placed a lot of emphasis on the idea that maybe there may have been some indirect purchases underlying the facts in the 1-0 cases, but that's nowhere on the face of the Supreme Court's opinion. From the very first line, Justice Breyer makes clear that it's a case about direct purchases and practices that occurred in the retail market. The focus of the conspiracy there was on inflating prices in the retail market, and that makes sense because the defendants were defendants that engaged in retail sales. So unlike here, where the defendants have only ever engaged in wholesale sales, at least during the trading that's discussed in Winter Storm Yuri, the defendants in 1-0, they were retail sellers, and so the conspiracy was affecting retail rates. Now, if you look at actual... If I have a voice, I'd like to ask a question. Excuse me. Your opposing counsel quoted, I believe, another sentence in 1-0 that referred to the target of the statute. Explain how you get around that language. Sure, Your Honor. So, I mean, at a couple points in opinion, the court talks about looking at what the statute as a whole intends to do, what are the aims of the statute as a whole, but the court does not say that that's dispositive. The court does not say that just because plaintiffs are bringing suit under a general antitrust statute, that means that the preemption analysis simply doesn't apply. The court says that that is one factor in the analysis, and that's a factor that Judge Crabtree here, in our case, considered. Judge Crabtree gave absolute deference to the fact that the Natural Gas Act does preserve a role for the states, but of course, Judge Crabtree correctly recognized that the Natural Gas Act exists exactly because the states have no traditional authority over the sphere of wholesale transactions. That was the Attleboro Gap that the Natural Gas Act was created to fill. So, when we are talking about the wholesale sphere and we're talking about prices and practices that involve interstate sales for resale under the language of the Natural Gas Act, that is an area where there's been no traditional state regulation. And so, even if you're looking at a state statute of general applicability, you have to look to see what the plaintiffs are actually asking a court to do, the conduct on which the plaintiffs are actually asking a court to impose liability. Of course, in Mississippi Power, the Supreme Court said that the principle that wholesale rates cannot be attacked by state law, that is a principle that is binding on state and federal courts. It's not just binding on state and federal regulators. It doesn't just apply to state regulations that affect only the natural gas industry. It is a principle that says that plaintiffs cannot come into court and use state law to try and ask for a redetermination of wholesale rates or a redetermination of the validity of wholesale practices that Congress has placed under exclusive federal authority. Plaintiffs, in their briefing in here today, have tried to reframe this case as one that is involving retail practices and retail rates, but that simply can't be squared with their complaints, which are, of course, what the court considers on a 12b6 motion. If you look at paragraph 89 of the Mell complaint, which is at page 180 of the first volume of the appendix, and I'll use Mell as representative of each of the five complaints in this case. Paragraph 89 lists the common legal and factual questions in this case, and those questions all involve questions targeted at wholesale prices and wholesale practices. So, for example, whether defendants charged KGS, the distributor there, unconscionable prices. Those are wholesale prices and wholesale transactions. Whether defendants profiteered by charging unconscionable prices to KGS. Wholesale prices and wholesale transactions. So, again, as Judge Crabtree found, as cases like EPSA and Hughes post-date 108 make clear, an incidental or a downstream effect on retail prices is not the scope of the court's analysis. The relevant scope of the court's analysis is what conduct are the plaintiffs actually targeting in this case, and what are plaintiffs actually asking the court to do. Here, the plaintiffs are asking a court to come in and redetermine the validity of rates that are exclusively under FERC's jurisdiction. Does it matter that there's no ruling by FERC here? They investigated and did nothing. Does that affect the analysis? No, it doesn't, Your Honor, for a couple of reasons. First, the touchstone of the preemption analysis is congressional intent, and Congress's intent in the Natural Gas Act and subsequent legislation was to create exclusive federal authority over the regulation of wholesale practices and prices. Since the passage of the Natural Gas Act, Congress has determined that the best way to preserve the various interests at play in the national natural gas market is to have a deregulated market. And so what Congress has intended is that market participants will presumptively set the rates for wholesale gas, subject to FERC's oversight and authority. So FERC has a variety of tools in its toolkit to address perceived manipulation or other perceived wrongdoing in the wholesale sphere. But what's critical for the purposes of preemption is that Congress intends FERC to be the one with the duty and the authority to oversee wholesale rates. And that makes sense, because as the plebeians and the briefing in this case make very clear, as does the case law, the national natural gas market is an interstate market. There are lots of connections between states. You know, transactions could be on one side of a state line or on another. Interstate pipelines go all across the country. And wholesale marketers, like the defendants here, they are going to be engaging in practices. They're subject to a patchwork of liability under different states' laws. That's exactly the opposite of what Congress intended. And furthermore, cases like Transco versus Mississippi from 1986, that illustrates that FERC doesn't need to make some sort of affirmative determination of whether or not a rate is valid for field preemption to apply. What matters is that Congress intended those decisions to happen solely under the FERC umbrella. But to respond to something that plaintiff's counsel said earlier today, the district court did not hold that there's no ability for Kansas to regulate retail rates. The district court did not hold that there's no recourse for consumers. And the district court did not hold that the KCPA is preempted in every application, certainly, or even in every application to the natural gas market. Let me talk about the KCPA for a second. In the Kansas cases that you cited, did any of those cases involve a dismissal that focused on defendant's role in the transaction that didn't amount to soliciting, engaging, enforcing consumer transactions? I'm trying to understand what that language actually means and whether that language has been fleshed out in Kansas cases. So in several of the cases that we cited, so for example, Ellaby and Berry and then Kastner from this court, they talk more generally about when an upstream supplier can be held liable under the KCPA. They said that where the defendant did not engage directly with the consumer, whether in terms of the transaction itself, and also in those cases there was no advertisement, no marketing, no solicitation, a KCPA claim wasn't stated. If you look at the cases that plaintiffs rely on, so Cole and Stare, the facts there flesh out what it does mean to solicit or engage. And so in Stare, for example, Goodyear, which was the upstream supplier, Goodyear had made representations to consumers, Goodyear had made warranties to consumers, and Goodyear played a role in enforcing the consumer transaction because it was ultimately responsible through a middleman for the return of defective product in that case and processing the return. Likewise, in Cole, HP had made advertisements to consumers, you know, and marketed its products in a certain way, which makes sense because when you have a consumer good, typically the manufacturer of the consumer good may participate in the marketing and advertising of the good, even if it's not the one who's actually selling it. Here, the complaints have no allegation whatsoever that defendants solicited, engaged in, or play a role in enforcing consumer transactions. Upstream wholesale marketers, they don't market natural gas to consumers, they don't solicit consumer transactions. The only relationship between defendants and any downstream party in this case are between defendants and their sophisticated commercial counterparties, like these very large gas distributors in Kansas. And the failure of plaintiffs to plead a substantive KCPA complaint mirrors why the because plaintiffs are trying to hold upstream suppliers in the wholesale market liable for conduct that takes place far downstream, that takes place in the sale to consumers, and neither the KCPA nor a federal law really permits that kind of broad scope of liability. Here, of course... Let me ask you, it feels like there's this tension in the Supreme Court's decision in 1OK, and it starts out with Justice Breyer saying the Natural Gas Act was drawn with meticulous regard for the continued exercise of state power, not to handicap or dilute it in any way. That's pretty broad language. And I feel like there's this tension, and so I guess I'm trying to figure out if there is, if we're taking the allegations of the complaints as true. So given that, there's no, in your estimation, even with this language that I think you have to agree doesn't set out a bright line test for us. I mean, there is some hedging in there, and it's certainly, I read the opinion to preserve the scope of state authority. So how do you square some of that language with the argument you're making here today? I mean, it feels like there are places where, if there's price gouging or some other wrongful conduct upstream, that consumers have the right to take action. How do you address that language? I think that the facts on the ground of what happened here during Winter Storm Erie and afterward, which are included in the complaint, demonstrates exactly the way that state and federal authority can work together in a complementary fashion. So FERC, as I said, has a variety of tools in its toolkit to investigate alleged wrongdoing on the wholesale side. FERC gets extensive market data. They receive huge amounts of financial trading data. They review that. They survey that. They follow up on tips. They did so here. They conducted a number of investigations. That's on the wholesale side. On the retail side, there are state agencies like the Kansas Corporation Commission, which here was also very active in the days and months following Winter Storm Erie. The KCC opened dockets to investigate the retail charges that were passed on by several distributors in this case. The KCC held extensive hearings, did extensive fact findings. Consumers were represented during those hearings by a consumer organization. The consumer organization participated in the settlement negotiations and the settlement approval. And the consumer organization was one of the parties that advocated for the settlements that were reached that are described in the complaints because they were in consumers' interest. So that shows that FERC operates on the wholesale line of the divide exactly as Congress intended. And then state regulators can operate on the retail side of the divide exactly as the state, exactly in line with the state preservation of authority under the NGA. What plaintiffs are trying to do here... But is there any language that says that is always the case, that there's a bright line rule? Bright line, of course, is a phrase that's used in many of the Supreme Court's other energy precedents. I mean, what One Oak is looking specifically is at the wholesale retail divide and says that where, you know, I agree, as EPSA says, they're not hermetically sealed, but you can look at what the actual target of a lawsuit is and you can say, is this lawsuit attacking prices and practices on the retail side or is it attacking prices and practices on the wholesale side? This case is much easier. Well, it's trying to address wrongs. Maybe the practices and the problems are at the wholesale side, but it's the consumers who suffered because of that conduct. And I think it's trying to address that issue, isn't it? Well, what Congress was trying to do in the Natural Gas Act is to figure out how is the market, including consumers, best going to be served. And what Congress determined was that the best interest of the market, including consumers, if I can finish answering the question, thank you. The best interest of the market, including consumers, is to have a uniform system of natural gas enforcement, and that falls under FERC's authority. One Oak itself says that Congress decided that a deregulated market was in the best interest of everyone, and that determination has to be honored. So what One Oak says is that when you are looking at a lawsuit that really is about retail practices and retail prices, that doesn't interfere with congressional intent because it doesn't cross the line into the interstate sales of natural gas for resale. But there's no dispute that that is what plaintiffs are attacking here, and that makes this a much easier case, frankly, than One Oak because everyone agrees that the crux of plaintiff's complaint is, in fact, wholesale prices and wholesale practices under FERC's exclusive jurisdiction. For those reasons, we think that the district court's thorough opinion is exactly correct, and we respectfully request that the court affirm. Thank you. Thank you, counsel. If you'd give one minute thirty. Thank you, Your Honor. Subject to the court's questions, I hope I can be faster than that. Two quick points. One, I'd just like to point out on page 24 to 25 of the appellee's answer brief, our list of published Supreme Court cases, what distinguishes every one of those cases from this case is that each of those cases relies on a specific state measure that targets interstate market participation. It's not a broad law of general applicability like the Kansas Consumer Protection Act. And then if I could just briefly follow up, Judge Holmes, on your question on suppliers, it occurred to me one more case to bring to your attention on the necessary connection between suppliers and a consumer transaction. I'd point to Villacristi v. Reed in the critical statutory language, at least in the non-class action case, is when a consumer is aggrieved by a supplier's conduct. They have a right of action under the KCPA. In the class action context, it's when a consumer suffers a loss as a result of a supplier's conduct. Subject to the court's questions. Thank you. Nothing further. Thank you, counsel. Thank you. Case is submitted. Thank you for your fine arguments.